FILED
OCT 15 2026
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | INDICTMENT |
| Plaintiff, | ) | |
| v. | ) | 5:26 CR 00476 |
| | ) | CASE NO. |
| STEVEN COMISAR, | ) | Title 18, United States Code, Sections 1028A(a)(1), 1341, 1343, 1344, and 2 |
| Defendant. | ) | JUDGE PEARSON |

GENERAL ALLEGATIONS

At all times relevant to this Indictment, unless otherwise specified:

1. Defendant STEVEN COMISAR resided in or around Los Angeles, California. Defendant resided in a guest room at Hotel 1.

2. Victim 1 and Victim 2, a married couple, resided in the Northern District of Ohio, Eastern Division. Victim 1 and Victim 2 owed Company 1.

3. Victim 3 resided in Vermont. Victims 1, 2, and 3 (together, the "Victims") were individuals age 60 or older, and so were "elders" within the meaning of the Elder Justice Act, Title 42, United States Code, Section 1397j.

4. Identity Theft Victim 1 was a person well known to the public as one of the wealthiest people in the world, including as a principal owner of Business 1, Business 2, and Business 3, major businesses well known to the public.

5. Person 1 resided in or around Rowland Heights, California. Person 1 was employed by Defendant as an on-call personal assistant and private aide from in or around 2023 through in or around September 2026.

6. Bank 1 was a federally insured financial institution based in or around San Francisco, California. Defendant maintained a checking account at Bank 1 ending in x9507 ("Defendant's Bank 1 Account").

7. Bank 2 was a federally insured financial institution based in or around McLean, Virgina. Defendant maintained a checking account at Bank 2 ending in x4636 ("Defendant's Bank 2 Account").

8. Bank 3 was a federally insured financial institution based in or around Pittsburgh, Pennsylvania. Company 1 maintained a business checking account at Bank 3 (the "Company 1 Bank 3 Account").

9. Bank 4 was a federally insured financial institution based in or around Cleveland, Ohio.

a. Victim 1 and Victim 2 maintained a personal checking account at Bank 4 ("Victim 1's Bank 4 Personal Account").

b. Company 1 maintained a business checking account at Bank 4 (the "Company 1 Bank 4 Account").

10. Bank 5 was a federally insured financial institution based in or around Canfield, Ohio. Victim 2 maintained a deposit account at Bank 5 ("Victim 2's Bank 5 Account").

11. Bank 6 was a federally insured financial institution based in or around Detroit, Michigan. Defendant maintained a checking account at Bank 6 ("Defendant's Bank 6 Account").

12. FedEx was a commercial interstate carrier in the business of providing air and ground parcel transportation, shipment, and delivery services.

## COUNTS 1 – 5
(Mail Fraud, 18 U.S.C. § 1341)

The Grand Jury charges:

13. The factual allegations contained in paragraphs 1 through 12 of this Indictment are incorporated by reference as if stated fully herein.

### The Scheme to Defraud

14. From in or around 2019, through in or around September 23, 2026, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant STEVEN COMISAR devised and intended to devise a scheme and artifice to defraud victims, including the Victims, and to obtain money and property, including money and funds under the custody and control of federally insured financial institutions, by means of false and fraudulent pretenses, representations, and promises.

### Purposes of the Scheme

15. The purposes of the scheme included, but were not limited to, the following: for Defendant to unjustly enrich himself and his designees by (a) obtaining funds from victims under false pretenses, (b) diverting proceeds for Defendant's use and the use and benefit of others and to further the scheme, and (c) concealing the scheme to defraud.

### Manner and Means of the Scheme

16. It was part of the scheme that:

a. Defendant created emails accounts (the "Fraudulent Email Accounts"), including the Macau Group Address, Macau CEO Address, Larry Weaver Address, Carr Address, Second Carr Address, FDIC Address, and the Harcourt Address. Defendant often established the Fraudulent Email Accounts through email providers who offered email service to

the general public, associating the Accounts with usernames and sender names that suggested the senders held particular positions or were affiliated with particular institutions.

b. Defendant obtained access to various telephone numbers (the "Fraudulent Telephone Numbers") that he controlled.

c. Defendant sought out lists of potential victims and their contact information, particularly targeting elderly Americans with funds to invest, and also requesting lists of such persons with Alzheimer's disease and dementia.

d. Defendant used the Fraudulent Email Accounts and Fraudulent Telephone Numbers to purport to be real and fictitious individuals (the "Fraudulent Personas") associated with a variety of real and fictitious institutions.

e. Through the Fraudulent Personas, Defendant presented victims, including the Victims, with various lucrative investment opportunities that Defendant had fabricated.

f. Defendant, without permission or lawful authority, used the name and identity of Identity Theft Victim 1, including in emails from Fraudulent Email Accounts, to give the false appearance that this real person was invested in, or otherwise associated with the investment opportunities Defendant was presenting to the Victims.

g. Defendant, through various Fraudulent Personas, instructed victims, including the Victims, to send money to him for these investments, including by instructing them to obtain cashier's checks, made out to, and sent through the mail and commercial interstate carriers to, variations of his real name, such as "S. Camisar," often to an address in Los Angeles, California, purportedly associated with an investment group when, in fact, the address was Defendant's guest room at Hotel 1. Defendant caused the Victims to send him more than $8.3 million through this scheme.

h. After receiving victims' invested funds, Defendant caused the checks to be cashed into bank accounts controlled by the Defendant.

i. Defendant did not invest the funds as he described to victims, and instead spent victims' funds for the benefit of himself and others, including gambling the invested funds at racetracks. Defendant frequently wrote checks to Person 1 and instructed Person 1 how to spend money received from victims.

j. To obtain additional funds from victims after their initial investments, Defendant falsely represented to victims that their investments had grown substantially but that there was a problem that required additional funds prior to cashing out victims' investments. At times, Defendant sought to threaten and intimidate victims with potential adverse consequences, including the loss of their investments and physical harm, if they did not immediately comply with instructions to send additional funds.

k. Defendant generally retained and used for his own personal benefit, including the costs of perpetrating the scheme, all of the funds he received from victims, rather than return any portion of victims' investments to those victims.

Acts in Furtherance of the Scheme

17. In furtherance of the scheme, and to accomplish its purposes and conceal the existence thereof, Defendant committed and caused to be committed, in the Northern District of Ohio, and elsewhere, the following acts, among others:

*Defrauding Victim 1*

18. On or about February 2, 2024, Defendant caused Victim 1 to receive an email from the Macau Group Address. The subject of the email was "Merger notice" and the purported author was Fraudulent Persona "Mei Zhang," who claimed to be the "Profit Distribution Manager" for the "Macau Group" in Hong Kong, China. The Macau CEO Address

and the Larry Weaver Address were copied on the email. The email gave the false appearance of a crisis involving another purported investor, including in the following text:[1]

> Our legal department has recently found a matter concerning you and your account that must be resolved before we can send you your three (3) profit check's totaling over $25,000,000.00 US.
>
> One of our longstanding rules prohibits clients from loaning each other money or commingling funds for the purpose of buying units or reimbursing us for funds we advanced for you to pay fees and other charges associated with your account.
>
> A recent investigation of one of our clients, Larry Weaver, has revealed that he has used his personal funds to help you pay off monies that we advanced for you. These funds must be reimbursed to us from you and not from any other client or third party.
>
> Unless we can resolve this matter within the next ten days we have no other choice but to close both you and Mr. Weaver[']s accounts. If this happens both of you will forfeit all of your profits. All decisions to close accounts are final and not subject to review or reconsideration.
>
> Our governments revenue bureau here in China penalized us for this rule violation by making us pay a large fine. Providing you reimburse us for the fine and other fees associated with this oversight on the part of yourself and Mr. Weaver, we will keep your accounts open and send you your profit checks as soon as we receive your cashiers check. Mr. Weaver has also been notified about this matter.
>
> Get a cashiers check first thing Monday morning, for $99,850.00 made payable to: S. Camisar. Send it by FedEx on Monday morning to: S. Camisar, [Hotel 1, Guest Room Number]. After we receive your cashiers check we will release all profit checks to you and Mr. Weaver without any interruption to your accounts.

19. On or about February 5, 2024, Defendant caused Victim 1 to obtain a cashier's check from the Company 1 Bank 3 Account in the amount of $99,850 payable to S. Camisar.

---

1 In this Indictment, the contents of the emails quoted are printed as they were in the original source, unless otherwise indicated through an ellipsis (". . .") or bracketed text to indicate omitted or modified text, or to explain the terms used.

20. On or about February 5, 2024, Defendant caused Victim 1 to purchase overnight delivery service through FedEx and send the cashier's check to S. Camisar at Hotel 1.

21. On or about February 6, 2024, Defendant caused the $99,850 cashier's check to be deposited into Defendant's Bank 1 Account at an ATM in Los Angeles, California, approximately one mile from Hotel 1.

22. On or about March 11, 2025, Defendant caused Victim 1 to receive an email from the David Carr Address. The subject of the email was "LEGAL NOTICE," and the purported author was Fraudulent Persona "David Carr," who claimed to be the "Wealth Director for Alliance Global Partners" in Geneva, Switzerland. The email created a false narrative in which Victim 1 owed additional investment funds, including in the following text:

> Mr. Li will still be your contact person in regards to all of your profits from your various investment programs which are all still generating profits. Please remember that to keep your accounts open and to avoid forfeiting any profits you will need to purchase at least one unit every calendar year. This is common practice with most sellers of non-registered securities and high profit investment programs like the ones you are currently involved with.
>
> Your first wire of $98M is scheduled to be sent on the next international wire sending date from Switzerland to the U.S. which is on March 15, 2025. In order to receive your wire on this date you will need to pay your one annual payment of $59,200 to cover all cost of insurance and other incidentals for the sending of your bank wires from Alliance One.
>
> We have collected your annual fee and the cost of one unit from Mr. Li ($109,200) as he is your rep for the purposes of your profit distribution with all three of the companies location in three different countries. You must send Mr. Li a cashiers check to reimburse him for paying your annual fees and the required annual unit. He has done this for all of the investors from The Macau Group and Dubai Investors Group.
>
> Once we have been notified that you have FedExed Mr. Li your cashiers check, we will put your wire on the top of the stack for all wires going to the U.S. on March 15. If you want to be included in

> the March 15 bank wires you must reimburse Mr. Li within the next 48 hours.
>
> Please reply to this email on the day you send your FedEx and text Mr. Li your tracking number so we can get your wire ready to be send on March 15, 2025.
>
> We have added the one required annual unit to your TMG [The Macau Group] account. You must add this amount with the reimbursement payment to Me. Li. You will be sending [] him $59,200 plus the $50,000 for the added annual required unit and send him a cashiers check tomorrow for $109,200 via Fedex.

23. On or about March 12, 2025, Defendant caused Victim 1 to obtain a cashier's check from the Company 1 Bank 4 Account in the amount of $109,200 payable to S. Camisar.

24. On or about March 12, 2025, Defendant caused Victim 1 to purchase overnight delivery service through FedEx and send the cashier's check to S. Camisar at Hotel 1.

25. On or about March 13, 2025, Defendant caused the $109,200 cashier's check payable to S. Camisar to be deposited into Defendant's Bank 1 Account at an ATM in Los Angeles, California.

26. On or about October 22, 2025, Defendant caused Victim 1 to receive an email from the FDIC Address, which was addressed to the Macau Group Account, with Victim 1 and numerous Fraudulent Email Accounts carbon copied, including the Macau CEO Address and the David Carr Address, and which began with text stating the email was an "[e]xtra copy of this email sent through security banking server in Washington DC USA to insure delivery immediately to" Victim 1, and then stated "CONFIRM RECEIPT OF THIS EMAIL ASAP." The subject of the email was "OFFICIAL BUSINESS," and the purported author was Fraudulent Persona "Johnny Li," who claimed to be the "CFO" for the Macau Group in Beijing, China. The email created a false narrative in which Victim 1 owed additional investment funds, including in the following text:

> Sadly, if you do not send your cashiers check for $100K on Wednesday, October 22, 2025, and if we don't receive it on Thursday, October 23, 2025, by noon, your time, you will have lost your last chance in this lifetime to become wealthy and live like a king.
>
> Every one of our other investors will be multimillionaires except you. We implore you to FedEx your $100K cashiers check immediately. My father Jimmy cried today because of the sadness in his heart for helping you so much and you betraying him like this. This is no way to treat such a great man like my father, James Li, after he was so kind to you.
>
> We also demand that pursuant to our strictest corporate rules that you NEVER discuss your business with us to any third party. This would open up an entirely different can of worms that we enforce very aggressively to protect our investors and corporate officers.
>
> We hope to receive a real FedEx tracking number first thing Wednesday morning from a FedEx envelope containing your $100K cashiers check that's on its way to us this time. May the Lord forgive you for the disrespect you showed my father, our board, and our sacred rules. For the last time, send your cashiers check and be wealthy like the rest of us. This will happen by the end of next week if you comply.

27. On or about October 22, 2025, Defendant caused Victim 1 to obtain a cashier's check from Victim 2's Bank 5 Account in the amount of $100,000 payable to S. Camisar.

28. On or about October 22, 2025, Defendant caused Victim 1 to purchase overnight delivery service through FedEx and send the cashier's check to S. Camisar at Hotel 1.

29. On or about October 23, 2025, Defendant caused the $100,000 cashier's check payable to S. Camisar to be deposited into Defendant's Bank 2 Account at an ATM in Los Angeles, California.

30. On or about December 21, 2025, Defendant caused Victim 1 to receive an email from the Harcourt Address. The subject of the email was "MERRY CHRISTMAS" with emojis, and the purported author was Identity Theft Victim 1, who described himself in the email as the "Founder and Chairman" of "Harcourt Elite Ventures Inc." The email created a false narrative in

which Identity Theft Victim 1 was offering Victim 1 a lucrative investment opportunity, including with images of Identity Theft Victim 1 and of logos and products from his businesses, and including in the following text:

> Dear [Victim 1],
>
> This holiday season I made a new friend and that friend is you, [Victim 1]. I look forward to meeting you in person in January when I fly in to [Ohio city] to visit you and TJ [another Fraudulent Persona].
>
> Please don't forget to send your $100,000 cashiers check on Monday so it lands at the L.A. forwarding hub on Tuesday.
>
> Email your FedEx tracking number after sending your overnight envelope on Monday. This will insure you get your first $5M wire before the end of December.
>
> Please remember this holiday season as the last one in which you suffer from financial worries. Beginning in 2026 your very [] savvy investment in Harcourt Elite will bring great generational wealth to everyone in your family for the rest of their lives.
>
> Have a safe New Year and I will be in touch right after the first.
>
> Your friend,
>
> [Identity Theft Victim 1]

31. On or about December 22, 2025, Defendant caused Victim 1 to receive an email from the Harcourt Address. The subject of the email was "Wire #1 on the way!" and the purported author was Fraudulent Persona "Tiffani Mendelssohn," who claimed to be sending the message as "Executive Secretary [f]or [Identity Theft Victim 1] et al." The email continued to perpetuate the false narrative that Identity Theft Victim 1 was offering Victim 1 a lucrative investment opportunity, including in the following text:

> Dear [Victim 1],
>
> Your first bank wire for $5M has been approved and will be sent as soon as your $100,000 cashiers check has arrived at the Los Angeles

> forwarding hub on its way to the Harcourt Elite Inc. payment processing center in New York.
>
> You will be sen[t] an email after your first wire for $5M has been sent next week. Automatic bank wires will be sent exactly 15 days after you receive the first wire so mark your calendar accordingly.
>
> Refer to your VIP account number whenever you request personal information from our VIP account centers across the country and abroad. Our offices remain closed for the holidays and will reopen on January 6th.
>
> Please note that if your payment does not pass through the Los Angeles payment forwarding hub by Wednesday, December 24, 2025, at the latest, your account will be permanently closed and your relationship with Harcourt Elite and [Identity Theft Victim 1] will be permanently terminated.
>
> If you have a business relationship with [Business 1], [Business 2], [Business 3], or any other [Identity Theft Victim 1] owned company, those relationships will also be permanently terminated if your payment does not reach the forwarding hub on Wednesday, December 24, 2025, at the latest. As [Identity Theft Victim 1] always says, "If you are not a man of your word, you are not a man."

32. On or about December 23, 2025, Defendant caused Victim 1 to obtain a cashier's check from the Company 1 Bank 4 Account in the amount of $100,000 payable to S. Camisar.

33. On or about December 23, 2025, Defendant caused Victim 1 to purchase overnight delivery service through FedEx and send the cashier's check to S. Camisar at Hotel 1.

34. On or about December 24, 2025, Defendant caused the $100,000 cashier's check payable to S. Camisar to be deposited into Defendant's Bank 2 Account at an ATM in Los Angeles, California.

35. On or about January 2, 2026, Defendant caused Victim 1 to receive an email from the Harcourt Address. The subject of the email was "WARNING!" with a fire emoji, and the purported author was Fraudulent Persona "Daniel Wheeler," who claimed to be part of Harcourt Elite Ventures Inc.'s "Security Department." The email contained images and the name of

Identity Theft Victim 1 and contained a line that read "cc [Identity Theft Victim 1]" at the end, giving the false appearance that Identity Theft Victim 1 would be copied. The email suggested that if Victim 1 failed to send additional funds, certain individuals would collect the funds from Victim 1 in person, including in the following text:

> Make sure you send TMG [The Macau Group] your cashiers check for $150K today and text them your FedEx tracking number.
>
> Word on the street is if you give them your usual story that you expected a wire but it didn't come in, they are sending very serious people to your doorstep to collect it in person next Thursday.
>
> You have until Wednesday. By then you will owe $300K with the late fees. If you haven't paid by then they will send the crew to collect the following day.
>
> Apparently, you made a fool out of Mr. Li in front of his board by him coming to your rescue over and over again, while you just stall him with your stories. Don't give him your usual bulls[**]t story. Just send him your cashiers check for $150K today, Friday. Or $200K on Monday, or $250K on Tuesday, or $300K on Wednesday.
>
> Remember, even if your account gets closed on Wednesday for not paying, you still owe him the money and he will collect it. Take my advice and just pay him today. If he closes your account that means your account with Harcourt also gets closed.

36. On or about January 2, 2026, Defendant caused Victim 1 to obtain a cashier's check from Victim 1's Bank 4 Personal Account in the amount of $150,000 payable to S. Camisar.

37. On or about January 2, 2026, Defendant caused Victim 1 to purchase overnight delivery service through FedEx and send the cashier's check to S. Camisar at Hotel 1.

38. On or about January 5, 2026, Defendant caused the $150,000 cashier's check payable to S. Camisar to be deposited into Defendant's Bank 2 Account at an ATM in Los Angeles, California.

39. On or about March 20, 2026, Defendant caused Victim 1 to receive an email from the Harcourt Address. The subject of the email was "Final offer!" with a money-bag emoji, and the purported author was Fraudulent Persona "Jimmy Li." The email threatened physical violence and "vengeance" by Li's "Triad brothers," referring to the China-based criminal organization, if Victim 1 failed to send additional funds, and encouraged Victim 1 to take the funds from employees' paychecks, including in the following text:

> I just wired the Private Banking Network $50,000 so now you only need to FedEx them $100K today to get your account reopened and your $300M wire on Tuesday.
>
> Get your cashiers check and FedEx it right [expletive] now! You said you have $50K so you only need another $50K. Take it from your business income, or payroll, you'll have it all back on Tuesday.
>
> . . .
>
> If you don't send your $100K today I will have no other choice but to allow my Triad brothers to seek vengeance on you for playing me for a fool. My Triad brothers will take care of it themselves for your utter disrespect to me.
>
> That would be very sad since all you have to do is fedex your cashiers check today before 4:00 PM and text PBN your tracking number. Then you will be a very wealthy man on Tuesday. It sure beats the alternative doesn't it?

*Defrauding Victim 3*

40. On or about September 17, 2026, Defendant caused Victim 3 to receive an email from the Second Carr Address. The subject of the email was "Urgent," and the purported author was Fraudulent Persona "David Carr." The email created a false narrative that Victim 3 owed additional investment funds, including in the following text:

> My stepfather is about to shred your profit check. If I were you I would send the $10K today and get the ten million. If you don't send it today you'll never get it ever.

> Seems like an easy decision to me. Within 4 days you'll be a millionaire. Or you'll never be one. P[l]ease FedEx it today. In 4 days you won't have a worry in the world.
>
> Tell Macau it's on the way and email them the FedEx tracking number.

41. On or about September 18, 2026, Defendant caused Victim 3 to write a personal check from Victim 3's personal bank account in the amount of $10,000 payable to S. Comisar.

42. On or about September 18, 2026, Defendant caused Victim 3 to purchase overnight delivery service through FedEx and send the personal check to Defendant at Hotel 1.

43. On or about September 21, 2026, Defendant caused the $10,000 personal check payable to S. Comisar to be mobile deposited into Defendant's Bank 6 Account.

44. On or about September 23, 2026, Defendant caused Victim 3 to receive an email from the Macau Group Address. The subject of the email was "Read this email now!" with a bar-graph emoji, but there was no listed author of the email. The email created a false narrative that Victim 3 owed additional investment funds and explained how Victim 3 should respond to bank representatives if Victim 3 was contacted about the nature of his check, including in the following text:

> In order to speed things up for you to get your profit check, we had your check deposited in [Bank 6]. They are an online bank with no physical locations.
>
> For some reason they contacted the person who the check was made payable to and had dozens of personal questions about you. Here is how you must handle this if your bank or [Bank 6] contacts you.
>
> As long as the check clears you have done everything asked of you and you will be receiving your profit check as soon as we know your bank paid the check to who it was made payable to: S. Comisar
>
> Because of our time honored Confidentiality policy, your job is to abide by our rules and never violate them. Breaking the rules, especially our confidentiality rules would result in your account

> getting immediately closed and your profits being immediately forfeited.
>
> Read this carefully:
>
> If you are contacted by your bank, [Victim 3's bank], or S. Comisar's bank, [Bank 6], and they ask you any questions whatsoever about your relationship with S. Comisar, Macau Group, or anything relating to any of the checks you gave us for $40,000 or $20,000 or $10,000, you tell them who you write checks to is none of their damn business and stay the fu*k out of your business! End of story.
>
> That will be your only answer in regards to any third party, that means any person besides yourself, who ask you any questions about your checks to S. Comisar or anything regarding him, us, and yourself. We were informed today that Ally Bank wanted to know who you were, your relationship to S. Comisar, did you write him those checks, what were the checks for, etc… Just a bunch of nosey a-holes.

45. On or about September 23, 2026, Defendant possessed Victim 3's personal check, dated September 18, 2026, for $10,000, payable to S. Camisar in his Hotel 1guest room. On the back of the check, Defendant had written "S. Comisar, for mobile deposit, [Bank 6]."

*Searching for Additional Victims*

46. On or about September 5, 2026, Defendant caused an email to be sent from his personal email address to a business ("Company 2") that advertised the sale of lists of names and contact information, or "leads," for "accredited investors," referring to regulations that restricted who can invest in certain securities offerings, often used as a shorthand for wealthy individuals because individuals could often be qualified as "accredited investors" if they had a net worth of over $1 million (excluding a primary residence). The email discussed a list of 1,000 "wealthy accredited investors over 90 years old with dementia and Alzheimer's" that Defendant had acquired from Company 2, seeking a spreadsheet format for the list for ease of use for mass emailing, and seeking additional emails for such "wealthy investors" to use for a "mass email

bomb" attempting to find "a few greedy old cadavers that I can sell before they croak," including in the following text:

> Thanks again for the list of 1000 email addresses to wealthy accredited investors over 90 years old with dementia and Alzheimer's.
>
> Is there any chance you could also email me the email addresses from the investor leads I purchased from you? I know they are printed on the leads but if you could email them to me on an excel sheet that would make it easy for me to copy and paste them into the email I'm going to send out.
>
> Also, if you have any more email addresses to wealthy investors, please email those to me on excel sheets. I'm going to use them to send out a mass email bomb and hopefully get a few greedy old cadavers that I can sell before they croak.
>
> I'm going to buy all my leads from you. I just need a few deals to get started. Remember, if you have some buyers you can't close anymore, send them my way and I'll have the checks sent to you and you can pay me whatever you think is fair (50/50).
>
> Thanks for everything. You're a real life saver.

47. On or about September 23, 2026, Defendant possessed an investor leads list with numerous names and contact information of various people located throughout the United States. The list was inside a FedEx shipping envelope addressed to Defendant from Company 2.

Execution of the Scheme

48. On or about the following dates, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant STEVEN COMISAR, for the purpose of executing the foregoing scheme and artifice to defraud, and attempting to do so, knowingly caused the following matters and things to be delivered by the United States Postal Service, and private and commercial interstate carriers, in accordance with the directions thereon, to wit, Defendant caused Victim 1 to send the following checks to Defendant at Hotel 1 as described below, each mailing constituting a separate count of this Indictment:

| Count | Date | Sender | Description of Mailing |
|---|---|---|---|
| 1 | February 5, 2024 | Victim 1 | $99,850 cashier's check |
| 2 | March 12, 2025 | Victim 1 | $109,200 cashier's check |
| 3 | October 22, 2025 | Victim 1 | $100,000 cashier's check |
| 4 | December 23, 2025 | Victim 1 | $100,000 cashier's check |
| 5 | January 2, 2026 | Victim 1 | $150,000 cashier's check |

All in violation of Title 18, United States Code, Section 1341.

COUNTS 6 – 11
(Wire Fraud, 18 U.S.C. § 1343)

The Grand Jury further charges:

49. The factual allegations contained in Counts 1 through 5 of this Indictment are incorporated by reference as if stated fully herein.

Execution of the Scheme

50. On or about the dates below, in the Northern District of Ohio and elsewhere, Defendant STEVEN COMISAR, having devised and intended to devise the foregoing scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, for the purpose of executing the foregoing scheme and artifice to defraud, and attempting to do so, knowingly caused to be transmitted the following writings, signs, signals, pictures, and sounds by means of wire communications in interstate commerce, to wit, Defendant, in California, caused emails to be sent from the Fraudulent Email Accounts to Victim 1, in the Northern District of Ohio, as described below, each transmission constituting a separate count of this Indictment:

| Count | Date | Description of Wire Transmission |
|---|---|---|
| 6 | February 2, 2024 | Email from the Macau Group Address to Victim 1 seeking $99,850.00 |

| Count | Date | Description of Wire Transmission |
|---|---|---|
| 7 | March 11, 2025 | Email from the Carr Address to Victim 1 seeking $109,200 |
| 8 | October 22, 2025 | Email from the FDIC Address to Victim 1 seeking $100,000 |
| 9 | December 21, 2025 | Email from the Harcourt Address to Victim 1 seeking $100,000 |
| 10 | December 22, 2025 | Email from the Harcourt Address to Victim 1 seeking $100,000 |
| 11 | January 2, 2026 | Email from the Harcourt Address to Victim 1 seeking $150,000 |

All in violation of Title 18, United States Code, Section 1343.

<u>COUNTS 12 – 16</u>
(Bank Fraud, 18 U.S.C. §§ 1344 and 2)

The Grand Jury further charges:

51. The factual allegations contained in Counts 1 through 5 of this Indictment are incorporated by reference as if stated fully herein.

<u>Execution of the Scheme</u>

52. On or about the following dates, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant STEVEN COMISAR, having participated in the foregoing scheme and artifice to obtain moneys, funds, and credits owned by and under the custody and control of federally insured financial institutions by means of false and fraudulent pretenses, representations, and promises, knowingly executed and attempted to execute the scheme to defraud by causing Victim 1 to withdraw funds from the bank listed below to purchase cashier's checks for Defendant as described below, each transfer of funds constituting a separate count of this Indictment:

| Count | Date | Bank | Description of Execution |
| --- | --- | --- | --- |
| 12 | February 5, 2024 | Bank 3 | Victim 1's withdrawal of $99,850 to obtain a cashier's check payable to Defendant |
| 13 | March 12, 2025 | Bank 4 | Victim 1's withdrawal of $109,200 to obtain a cashier's check payable to Defendant |
| 14 | October 22, 2025 | Bank 5 | Victim 1's withdrawal of $100,000 to obtain a cashier's check payable to Defendant |
| 15 | December 23, 2025 | Bank 4 | Victim 1's withdrawal of $100,000 to obtain a cashier's check payable to Defendant |
| 16 | January 2, 2026 | Bank 4 | Victim 1's withdrawal of $150,000 to obtain a cashier's check payable to Defendant |

All in violation of Title 18, United States Code, Sections 1344 and 2.

COUNTS 17 – 18
(Aggravated Identity Theft, 18 U.S.C. §§ 1028A(a)(1))

The Grand Jury further charges:

53. The factual allegations contained in Counts 9 and 10 of this Indictment are incorporated by reference as if stated fully herein.

54. On or about the following dates, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant STEVEN COMISAR, did knowingly transfer, possess, and use, a means of identification of another person, without lawful authority, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit: Wire Fraud, in violation of Title 18, United States Code, Section 1343, knowing that the means of identification belonged to another actual person, each instance of transfer, possession, and use constituting a separate count of this Indictment:

| Count | Date | Description of Predicate Felony and Means of Identification |
|---|---|---|
| 17 | December 21, 2025 | Wire fraud in the sending of an email using the name of Identity Theft Victim 1, as charged in Count 9 |
| 18 | December 22, 2025 | Wire fraud in the sending of an email using the name of Identity Theft Victim 1, as charged in Count 10 |

All in violation of Title 18, United States Code, Section 1028A(a)(1).

A TRUE BILL.

Original document - Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.